UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
CHRISTIAN FIGUEROA,                                         :
                                                            :
                              Petitioner,                   :
                                                            :       No. 10 Civ. 1821 (RA)(HBP)
                 -v-                                        :
                                                            :       OPINION AND ORDER
VINCENT N. SCHIRALDI, Commissioner of                       :
the New York City Department of Probation                   :
and ANDREW M. CUOMO, Attorney General                       :
of the State of New York,                                   :
                                                            :
                              Respondents.                  :
                                                            :
------------------------------------------------------------X

RONNIE ABRAMS, United States District Judge:

Petitioner Christian Figueroa has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition") challenging his conviction following trial on charges of grand larceny. In a Report and Recommendation dated November 20, 2012 ("the Report"), Magistrate Judge Pitman recommended that the Petition be denied in its entirety. For the reasons set forth below, the Court adopts the thorough and well-reasoned Report in its entirety. Accordingly, the Petition is DENIED.

I.   Background

   A.   Facts Giving Rise to the Indictment

   From 2000 to 2003, Figueroa worked in the finance department of Clarity Payment Solutions, Inc. ("CPS"). (Trial Transcript ("Tr.") at 318.) While working for CPS and after leaving the company in July 2003, Figueroa used a company credit card for personal expenses including plane tickets and a $3,459.70 watch. (Id. at 319, 322-23, 327-48.) CPS discovered the personal expenses in August 2003 and contacted Figueroa. (Id. at 263; Affidavit of Christian

Figueroa, Aug. 9, 2007 annexed as Ex. 1 to Lyons Decl. ("Pet. Aff.") ¶ 4.)  Initially, Figueroa denied having a company credit card but soon after admitted to having such a card and using it for personal expenses.  (Tr. at 268-70.)  Thereafter, he entered into civil negotiations with CPS to work out a plan to repay the company.  (Id. at 270-71.)

      B.      **Agambila's Representation of Figueroa**

Figueroa retained Apaamoore Agambila, an immigration lawyer and his fiancée's boss, to represent him pro bono during the civil negotiations.  (Pet. Aff. at ¶ 5-7; Affidavit of Apaamore Agambila, Jan. 12, 2007 annexed as Ex. 2 to Lyons Decl. ("Agambila Aff.") ¶ 2.)  On May 13, 2004, as the civil negotiations proceeded, Figueroa was indicted on two counts of grand larceny in the third degree and two counts of grand larceny in the fourth degree, in violation of New York Penal Law §§ 155.35(1) and 155.30(1), respectively.[1]  (Indictment, annexed as Ex. 3 to Lyons Decl. at 1-2.)  Although he had no experience in criminal matters, Agambila agreed to represent Figueroa in the criminal case as well.  (Agambila Aff. ¶ 11; Pet. Aff. ¶ 12.)

During the course of the civil negotiations, TSYS Prepaid ("TSYS"), which had acquired CPS, sent Agambila a draft settlement agreement on September 24, 2004.  (Tr. at 403-04; Pet. Aff. ¶ 8.)  According to Figueroa, he "expressed [] concerns" about statements contained in the agreement, including that "[d]uring the course of his employment and thereafter [he] improperly and fraudulently made personal charges on [CPS credit cards] and concealed same."  (Pet. Aff. ¶ 8.)  As a result of his concerns, certain changes were made to the agreement.

Nonetheless, Figueroa claims to have remained hesitant about signing the agreement with

---

[1] Each count of larceny was based on a different purchase or series of purchases.  Count One, which charged grand larceny in the third degree, included all of the transactions made by Figueroa during and after his employment with CPS with the exception of the purchases specifically provided for in Counts Two through Four.  (Tr. at Judge's Charge 20.)  Count Two, which also charged grand larceny in the third degree, related to Figueroa's purchase of a Tourneau watch on or about June 6, 2003.  (Id. at 22.)  Counts Three and Four, which charged grand larceny in the fourth degree, related to a purchase from Best Buy and the payment of parking fines, respectively.  (Id.)

2

TSYS as drafted. (Pet. Aff. ¶ 11.) Figueroa has affirmed that "[w]hen [he] continued to express reservations about signing the agreement, Mr. Agambila assured [him] that signing the agreement would make the criminal case 'go away.'" (Id.) Figueroa also claims that Agambila "told [him] not to worry because 'concealment is not a crime.'" (Id. ¶ 10.) Agambila has explained that because he expected that the criminal case would not proceed after the agreement was signed, he viewed the "incriminating language" remaining in the agreement "as a non-issue and advised Mr. Figueroa to sign the Agreement." (Agambila Aff. ¶ 10.) Agambila gave no advice about the potential admissibility of the agreement at a criminal trial on Figueroa's grand larceny charges. (Id.)

The final settlement agreement (the "Agreement"), which Figueroa signed on September 28, 2004, still contained some language that Figueroa had expressed concerns about, namely that "[d]uring the course of [his] employment and thereafter [Figueroa] improperly and without authorization made personal charges" on CPS credit cards. (Agambila Aff. ¶ 5.) The Agreement, however, also provided that, "[i]t is understood and agreed that the above release is being made in settlement and compromise of a doubtful claim or claims and is not to be construed as admission of liability . . . ." (Id.) It further provided that Figueroa would pay $5,117.00 in settlement of TSYS's claim and that, in return, TSYS would "communicate to the prosecutor in the Criminal Case that Figueroa has agreed to repay [the losses] . . . and request said prosecutor to discontinue the complaint and prosecution of Figueroa . . . ." (Id.)

Although TSYS did indeed write to the New York County District Attorney's Office, (id. ¶ 7), that office nonetheless chose to proceed with its larceny case against Figueroa. Agambila filed a motion to dismiss the charges which was unsuccessful. As the criminal trial approached, Figueroa "discovered that Mr. Agambila had no experience with criminal law and was facing

3

circumstances that would make it difficult for him to attend to [Figueroa's] criminal case." (Pet. Aff. ¶ 12.)  On December 7, 2004, Figueroa submitted a letter to the judge presiding over his criminal case "indicating [his] desire to have new counsel appointed to [him] by the court." (Id.) Two days later, Agambila moved to be relieved as counsel arguing that his representation was suffering because of Figueroa's desire to change counsel. (Motion to be Relieved as Counsel, Dec. 9, 2004, annexed as Ex. 6 to Lyons Decl.; Agambila Aff. ¶ 11.)  According to Agambila, believing his motion would be granted, he relinquished control of the criminal case file until the day trial commenced and did not actively prepare for the trial. (Agambila Aff. ¶ 11.)

On December 10, 2004, Agambila's motion to be relieved as counsel was denied. (Transcript of Dec. 10, 2004 Conference, annexed as Ex. 7 to Lyons Decl., at 2-3.)  In so doing, the court noted that Agambila had been on the case since July and that no new counsel had appeared for Figueroa.  (Id.)  Trial commenced on December 13, 2004.  (Tr. at 1.)  At the start of the trial, Agambila renewed his request to be replaced by appointed counsel, citing personal reasons, Figueroa's preference that he be replaced and his lack of time to prepare.  (Id. at 4-5.) Again, the trial court denied the request.  (Id. at 5.)

At trial, Agambila argued to the jury that personal use of CPS credit cards was common practice at the company and that some of Figueroa's allegedly improper credit card purchases were for legitimate business purposes.  With regard to parking tickets paid for with Figueroa's CPS credit card, Agambila elicited testimony from Jonathan Weiner, CPS's President and Chief Operating Officer, that it was "possible" that some of these tickets were legitimate business expenses.  (Id. at 309-11.)  From Figueroa, Agambila elicited testimony that it was "pretty much a normal thing" to purchase personal items with CPS cards and later reimburse the company and that "many people" did this within the company.  (Id. at 322-33.)  He admitted that his purchases

4

of a luxury watch and plane tickets were personal expenses, but pointed to the Agreement as evidence of his intent to repay.  (Id. at 322-27.)

To refute that assertion, the prosecution called three CPS employees as witnesses, two of whom testified that Figueroa had not notified them of his personal charges.  Moreover, Michael Sands, Figueroa's supervisor, testified that Figueroa was responsible for coding the credit card transactions of CPS, namely that he was required to categorize invoices by the departments to which they corresponded.  (Id. at 441-42.)  Sands testified that Figueroa never brought to his attention any personal charges that he had made with his CPS credit card.  (Id. at 444.)  During Figueroa's cross-examination, the prosecution highlighted the Agreement's statement that Figueroa had "improperly and without authorization made personal charges on the Charge Card and concealed same."  (Id. at 417-26.)  The prosecution also used this language in it summation to argue that Figueroa had already admitted to committing the crimes at issue.  (Id. at 481-82.)

Agambila's trial strategy also focused on Figueroa's state of mind at the time he allegedly made the fraudulent purchases.  In his opening statement, Agambila emphasized to the jury that "if . . . [it was] unable to determine that [Figueroa] used the card with the intention not to pay the employer back, then . . . [it] should find him not guilty."  (Tr. at 255, 227.)  Agambila's summation again asserted that Figueroa had "the intention [to repay] at the time that he went in to buy the watch or to pay for the tickets" and that "[t]he intention to conceal or steal would have to be at the time that [Figueroa] committed the act and not subsequently[.]"  (Id. at 465.)  The prosecution's summation called this argument "insane" and countered that regardless of Figueroa's state of mind when he made the purchases, "the moment that the defendant in his mind decided he wasn't paying it back, that's when the theft occurred."  (Id. at 469.)

On March 23, 2005, Figueroa was convicted of two counts of grand larceny in the third

degree and acquitted of two counts of grand larceny in the fourth degree. He was sentenced to five years probation. (Agambila Aff. ¶ 2; Petitioner's Objections to the Report and Recommendation, Dec. 20, 2012 ("Pet. Obj.") at 1.)

### C. Procedural Background and Habeas Petition

On April 21, 2005, Figueroa initiated a direct appeal in the Appellate Division, First Department. On August 20, 2007, while his direct appeal was pending, Figueroa moved the trial court to vacate his conviction on grounds that Agambila had rendered ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 686-87 (1984). In the motion, the grounds for Figueroa's alleged Strickland violations were that Agambila: (1) advised Figueroa to enter into a "highly prejudicial" agreement; (2) continued to represent Mr. Figueroa notwithstanding the fact that he was "conflicted;" (3) did not present an adequate or properly supported motion to be relieved as trial counsel; (4) did not adequately prepare for trial; and (5) relied on an incorrect legal theory as "the backbone of Mr. Figueroa's defense at trial." (Affirmation of Rebecca Reilly in Support of Motion to Vacate Judgment, Petitioner's C.P.L. § 440 motion, annexed as Ex. 8 to Lyons Decl., ¶ 2.) In support of Figueroa's motion, Agambila submitted an affidavit regarding his representation. The trial court denied the motion to vacate on April 28, 2008, concluding that there was "no basis to conclude that defendant was deprived of 'meaningful representation' or 'reasonably effective assistance.'" People v. Figueroa, Ind. No. 2629/04 at 2-3 (N.Y. Sup. Ct. Apr. 23, 2008). The trial court also found that "[w]hile some of defense counsel's decisions might be viewed, in hindsight, as strategic errors, counsel's conduct of the trial appears to have been based on a thorough understanding of the facts of the case and the applicable law." Id.

On September 29, 2009, Figueroa consolidated a new appeal from the trial court's denial

of his motion to vacate with his still-pending direct appeal. He presented largely the same claims of ineffective assistance, which the Appellate Division rejected on June 9, 2009. People v. Figueroa, 880 N.Y.S.2d 631, 633-34 (1st Dep't 2009). Figueroa then sought leave to appeal to the New York Court of Appeals, which was denied without opinion on August 31, 2009. People v. Figueroa, 13 N.Y.2d 744 (2009). On March 8, 2010, Figueroa filed the instant Petition, arguing that the Appellate Division's determination that he had received effective assistance of counsel was an unreasonable application of Strickland. After Judge Pitman issued his Report on November 20, 2012 recommending that the Petition be denied in its entirety, Figueroa filed objections to the Report.

## II.  Standard of Review

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The district court shall conduct a de novo review of those sections of a report to which a petitioner objects. To accept those parts of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." Adee Motor Cars, LLC v. Amato, 388 F. Supp. 2d 250, 253 (S.D.N.Y. 2005) (internal quotation marks and citation omitted).

Under the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254, ("AEDPA"), a writ of habeas corpus may not issue unless the state court's decision was "contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(1), (2). State court factual findings "shall be presumed to be correct" and the

petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  Id. § 2254(e)(1).  "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).

**III.   Discussion**

In Strickland v. Washington, 466 U.S. 668, 687 (1984), the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel.  See Bloomer v. United States, 162 F.3d 187, 192 (2d Cir. 1998).  First, the petitioner must demonstrate that defense counsel's performance was so "deficient" that it "fell below an objective standard of reasonableness;" and second, there must be a "reasonable probability that, but for counsel's . . . errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 669, 694.  The standard for ineffective assistance of counsel articulated in Strickland constitutes "clearly established law" under AEDPA.  Davis v. Greiner, 428 F.3d 81, 87 n.5 (2d Cir. 1984).

With respect to the first prong of the Strickland test, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," as "[t]here are countless ways to provide effective assistance in any given case."  Strickland, 466 U.S. at 689.  Moreover, "[a]ctions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel."  Gibbons v. Savage, 555 F.3d 112, 122 (2d Cir. 2009).  A court's inquiry examines the reasonableness of counsel's performance "from counsel's perspective at the time" and "considering all the circumstances."  Strickland, 466 U.S. at 669, 689.

Once a deficiency is established, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

8

different." Id. at 694; United States v. Caracappa, 614 F.3d 30, 46 (2d Cir. 2010). In applying this standard, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; Wilson v. Mazzuca, 570 F.3d 490, 507 (2d Cir. 2009). Moreover, "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 131 S. Ct. 770, 792 (2011); Santone v. Fischer, 689 F.3d 138, 155 (2d Cir. 2012).

The Report concludes that Figueroa cannot demonstrate that he received constitutionally ineffective assistance of counsel. In his objections, Figueroa argues that the Report erred in its consideration of: (1) Agambila's advice to sign the Agreement; (2) the relevance of Agambila's "subjective ignorance" of the risks associated with the Agreement; (3) the prejudice suffered by Figueroa due to the admission of the Agreement at his criminal trial; (4) Agambila's failure to raise certain arguments regarding the Agreement due to his alleged conflict of interest; and (5) Agambila's alleged misunderstanding of the law regarding larceny and the adequacy of his trial preparation. For the following reasons, the Court agrees with the Report's conclusions and concludes that Figueroa has failed to show that the state court unreasonably applied Strickland in denying his ineffective assistance of counsel claims.

### A. Alleged Ineffective Assistance Arising out of the Agreement

Four of Figueroa's objections focus on the Report's conclusions regarding the Agreement. The first two objections contend that contrary to the Report's conclusions, Agambila's advice to sign the Agreement was both deficient and an objectively unreasonable strategy. (Pet. Obj. at 8, 11.) Figueroa further argues that the prosecution's use of the "highly inculpatory Settlement Agreement" prejudiced him at trial. (Id. at 13). Lastly, Figueroa maintains that Agambila's representation was ineffective due to his conflict of interest. (Id. at

9

16.)

### 1. Advice to Sign the Agreement

For the reasons outlined at greater length in the Report, the Court agrees that the state court did not unreasonably apply Strickland in concluding that Agambila's representation in connection to the Agreement was not deficient. Figueroa contends that "to provide competent representation, counsel needed to understand and explain the risks associated with signing" the Agreement, and that Agambila failed to do this. (Id. at 7.) Figueroa maintains that Agambila's incompetent representation is demonstrated by his statement that "the prosecutor would probably not be able to proceed with the case" once Figueroa signed the Agreement. (Agambila Aff. ¶ 9; Pet. Obj. at 7-8.) Moreover, Figueroa argues, Agambila "fail[ed] to recognize that an admission of concealment was an admission to one element of larceny." (Pet. Obj. at 12.)

Although Agambila acknowledges that he "knew that some of the language in the Agreement could be incriminating" (Agambila Aff. ¶ 6), he advised Figueroa to sign the Agreement because it required TSYS to request dismissal of the criminal charges against Figueroa and he "did not believe that the prosecutor would proceed" in light of that request. (Id. ¶ 10.) As the state court concluded, despite the risks attendant to signing the Agreement, Agambila could have reasonably determined that TSYS's request was Figueroa's "best chance to avoid being convicted." Figueroa, 880 N.Y.S.2d at 633. While perhaps "overly optimistic," as Judge Pitman noted, this strategy was reasonable "from [his] perspective and at the time" of his performance, "considering all the circumstances," including the large body of evidence against Figueroa. See Strickland, 466 U.S. at 669, 689; United States v. Castillo, No. 07 Civ. 3401 (KMW), 2009 WL 4250512, at *3 (S.D.N.Y. Nov. 30, 2009) (rejecting deficiency claim as to pretrial stipulations because facts could easily be proven and stipulations might accrue a strategic

advantage).

### 2. Prejudice Resulting from the Admission of the Agreement

Figueroa also objects to the Report's conclusion that, assuming *arguendo* that Agambila's advice was deficient, the result of the proceeding would have been different but for that advice. (Pet. Obj. at 13.) The Court agrees with the Report's conclusion that the overwhelming evidence of Figueroa's guilt ensured that none of the alleged deficiencies would have altered the outcome of the case. The evidence demonstrated that Figueroa charged thousands of dollars to CPS credit cards for personal purchases, including a $3,459.70 watch and plane tickets. (Tr. at 243-54, 274-75, 403.) These purchases were not "coded" as "other receivables," which would have indicated to the company that they were personal. (Id. at 242-43.) Moreover, both the Executive Vice-president of CPS and Figueroa's supervisor testified that Figueroa never informed them of these, or any, personal charges, as he was required to do. (Id. at 260-61, 444.) There was also testimony that when Figueroa was confronted by CPS about the charges, he initially denied even having a CPS credit card and that he continued to make personal purchases after he left the company by using a co-worker's credit card number. (Id. at 244-46, 268-69.) Figueroa's testimony confirmed that he did in fact charge several personal expenses on the CPS credit card without notifying the company. (Id. at 323, 327-31, 388-89.) Given this context, it was not unreasonable for the state court to have concluded that even if Figueroa could prove deficiencies in Agambila's representation regarding the Agreement, such deficiencies would not have undermined the reliability of the trial result. See Gonzalez v. Ercole, No. 08 Civ. 403 (CS)(PED), 2011 WL 5924443, at *21 (S.D.N.Y. Sept. 22, 2011) ("The evidence of guilt was simply too weighty, and the substance of [the deficiency] not sufficiently material, for [it] to have undermined confidence in the verdict."); Cheng v. Grenier, No. 02 Civ.

11

4804 (DC), 2003 WL 22801348, at *6 (S.D.N.Y. Nov. 25, 2003) (concluding that prejudice cannot be demonstrated given "overwhelming evidence of petitioner's guilt").

### 3. Alleged Conflict of Interest

Also in contention is the Report's conclusion that Agambila's trial performance was not compromised by his alleged conflict of interest. Figueroa asserts that Agambila was conflicted because he would have needed to highlight his own incompetence in advising Figueroa to sign the Agreement in order to effectively represent Figueroa. Where an ineffective assistance of counsel claim is based on a conflict of interest, a showing of prejudice may be presumed if counsel "actively represented conflicting interests," and "an actual conflict of interest adversely affected [the] lawyer's performance." Strickland, 446 U.S. at 692 (citing Cuyler v. Sullivan, 446 U.S. 335, 350 (1980)). The presumption only applies if the petitioner establishes: (1) that "the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action;" (2) a lapse in representation demonstrated by the existence of "some plausible alternative defense strategy not taken up by counsel;" and (3) "that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." United States v. Moree, 220 F.3d 65, 69 (2d Cir. 2000).

The Report concluded that there was no actual conflict of interest in this case because testimony regarding Agambila's incompetence was immaterial to whether or not Figueroa committed larceny. (Report at 34.) Additionally, the Report surmised that testimony showing that Figueroa signed a document that he believed was false because of bad legal advice could have impugned Figueroa's credibility because it would have shown that Figueroa was "willing to lie if counsel advised him to do so." (Id. at 35.) Accordingly, the Report concluded that there was no lapse of representation because there was no alternative defense strategy. (Id.) Figueroa

objects, arguing that had the jury "been provided with a compelling explanation of why petitioner, despite his innocence, ultimately signed the agreement" it "would understand petitioner's actions and would [have] been unlikely to hold them against petitioner." (Pet. Obj. at 16-17.)

The Court agrees with the Report that Agambila's representation of Figueroa was not ineffective because of a conflict of interest. Although the admission in the Agreement may have constituted helpful evidence against Figueroa at trial, testimony that Figueroa signed the Agreement in part because Agambila told him that it would make the criminal case "go away" would not have changed the statements themselves or the fact that Figueroa willingly signed the Agreement. Moreover, as noted in the Report, the record is devoid of any evidence demonstrating that Agambila's representation was influenced by a desire to protect himself from malpractice claims. Indeed, in support of Figueroa's motion to vacate, Agambila submitted a candid affidavit acknowledging that the advice that he gave Figueroa turned out to be wrong as well as additional shortcomings in his representation. Accordingly, Agambila's failure to elicit testimony highlighting his own alleged incompetence does not reflect a decision based in an actual conflict of interest and falls within the wide permissible range of professional assistance. See Strickland, 466 U.S. at 689.

### B. Alleged Ineffectiveness in Trial Preparation and due to Ignorance of the Law

In addition to his objections regarding the Agreement, Figueroa argues that the Report erred in finding no deficiency in Agambila's understanding of the crime of larceny or his general trial preparation. (Pet. Obj. at 17.) This broad claim is belied by the record. Figueroa argues— but fails to demonstrate—that Agambila "fundamentally misunderstood the crime of larceny." (Id. at 18.) Although it is true that at trial Agambila focused on Figueroa's intent at the time he

13

made the purchases rather than whether he later developed the intent to steal, given the uncontroverted evidence that Figueroa left the company without reimbursing it for his personal expenses, this was a reasonable strategic choice. Strickland, 466 U.S. at 681 ("[S]trategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based.") Notably absent from Agambila's affidavit is any sort of admission that he misunderstood the intent requirement for the crime of larceny and there is no reason to believe that he did so. See McKenzie v. Greene, No. 05 Civ. 9420 (LTS)(KNF), 2008 WL 1944032, at *6 (S.D.N.Y. Apr. 30, 2008) (reasoning that because petitioner "failed to submit any competent evidence that his trial counsel was unfamiliar with the applicable state law . . . Strickland's strong presumption must stand.").

    Figueroa has similarly failed to show that the state court's consideration of Agambila's general trial preparation was constitutionally inadequate. While it is true that the record reflects that Agambila relinquished Figueroa's file after moving to be relieved of counsel and did not regain possession of it until the commencement of trial, this in and of itself does not demonstrate a deficiency in legal representation. Agambila, having worked on the case for approximately seven months, was intimately familiar with the facts of the case prior to relinquishing the file, as demonstrated by his ability to effectively examine the trial witnesses on the details of Figueroa's purchases and experience at CPS. Furthermore, although Figueroa claims that Agambila could have called more witnesses or investigated the case more thoroughly, and Agambila acknowledges that he did not speak with any potential witnesses in advance of trial, (Agambila Aff. ¶ 12), this alone is insufficient to establish ineffective assistance of counsel. See Cullen, 131 S. Ct. at 1404 (rejecting habeas challenge where only one witness, defendant's mother, was called to support "family sympathy defense"); see also Caracappa, 614 F.3d at 46 (recognizing

that counsel's duty to call favorable witnesses "does not . . . compel counsel to conduct a comprehensive investigation of every possible lead or defense"). Agambila cross-examined each of the prosecution's witnesses and called Jonathan Weiner and Figueroa as defendant witnesses. The testimony he elicited from each witness supported reasonable theories of innocence, including that Figueroa lacked the requisite intent to commit a crime and that some of the purchases in question were legitimate business expenses. Thus, the state court's determination that "counsel's conduct during trial indicated a thorough understanding of the facts of the case, and demonstrated that counsel was prepared," Figueroa, 880 N.Y.S.2d at 633, was not an unreasonable application of Strickland.

Figueroa has raised no objections to the remainder of Magistrate Judge Pitman's Report. Finding no clear error, the remainder of the Report is adopted.

### IV. Conclusion

In sum, Figueroa has failed to demonstrate that the state court unreasonably applied Strickland and the Petition is thus denied. A certificate of appealability will not issue because Figueroa has not made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253; Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005). The Clerk of Court shall dismiss this Petition and close the case.

SO ORDERED.

Dated: July 8, 2013
New York, New York

Ronnie Abrams
United States District Judge